

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JGH                          *271 Cadman Plaza East*
F.#2017R01183                        *Brooklyn, New York 11201*

August 12, 2022

By ECF and Email

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:     United States v. Parveg Ahmed
                        Docket No. 17-CR-378 (AMD)

Dear Judge Donnelly:

                The government writes in opposition to the defendant's motion for release on bail, and instead requests that the parties proceed to sentencing on the currently scheduled date of September 12, 2022.

                The defendant pleaded guilty in 2018 to providing material support to the Islamic State of Iraq and al Sham ("ISIS") after he attempted to travel with a co-conspirator to Syria, where he planned to fight and kill others on behalf of the organization. According to a draft note found in an electronic device in the possession of the defendant and his co-conspirator, the defendant planned to tell his family that he "will join the Jihad very soon and in Sha Allah [God willing] we will then join the ranks of the Shuhuda [martyrs]." In light of the defendant's conduct, which is further summarized in the complaint and detention memorandum previously filed in this case,[1] at the upcoming sentencing, the government intends to seek a Guidelines sentence of twenty years' imprisonment.

                As discussed in the original detention memorandum and the government's prior opposition to release on bail, see ECF Nos. 4 and 33. and as can be further detailed upon the Court's request, the defendant is both a flight risk and danger to the community. Notably, under the Bail Reform Act, because the defendant pleaded guilty to providing material support to a

---

[1] The government attaches hereto, as Exhibits 1 and 2, the original detention memorandum in this matter, as well as the government's opposition to the defendant's prior motion for release. The government is prepared to respond in detail to the defendant's instant motion if the Court requires further information in order to deny the motion.

foreign terrorist organization under 18 U.S.C. § 2339B, the Court is required to order the defendant's detention unless (A)(i) there is a "substantial likelihood that a motion for acquittal or new trial will be granted;" or (ii) an attorney for the government "recommended that no sentence of imprisonment be imposed on the person" and (B) the Court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." See 18 U.S.C. § 3143(a)(2). The defendant does not satisfy this standard. The government previously detailed at length why the defendant should not be released on bond following his guilty plea. See ECF No. 33 (attached as Exhibit 2). The Court found that the relevant bail factors "weigh[ed] strongly in favor of the defendant's continued detention," ECF No. 37 at 2-3, and that the defendant "remains a flight risk and a danger to the community," id. at 4. That risk of flight has only grown more acute with the defendant's sentencing – and imposition of a significant term of imprisonment – approaching in one month.

The proper result in this case is to proceed to sentencing, as scheduled, on September 12, 2022. The lengthy delay between plea and sentencing has been due primarily to requests from defense counsel for additional time. See Motions to Continue Sentencing (ECF Nos. 20, 22, 26-30, 38-41, 44-47). The government consented to adjournments on every occasion. In March 2022, the government advised that it wished to proceed to sentencing, and would no longer consent to adjournments. Defense counsel indicated their understanding and requested one final adjournment of 90 days, to which the government consented as a professional courtesy. In June 2022, defense counsel advised that July had "become unavailable for me" and requested consent to another adjournment. Despite the government's past position, the government agreed to consent to the adjournment as a courtesy with the expectation that sentencing would proceed at the next available date, which the Court scheduled for September 12, 2022. It now appears that the defendant's repeated requests for additional time to prepare for sentencing have in fact been for the purpose of putting together this bail application.

At no point in the course of discussing the defendant's requests for the government's consent to an adjournment in March or July 2022 did defense counsel advise the government of their intent to move for release on bail. Indeed, the government only learned of this motion yesterday. This is particularly troubling because the defense relies primarily on a forensic evaluation report from June 28, 2021, which, more than a year ago, the government reviewed and advised defense counsel that it considered the report to be an inadequate basis for release. The government's conclusion was based, in part, on the fact that the defendant's own evaluation indicates that he "currently poses a moderate risk for terrorist targeted violence."

After receiving the defendant's application yesterday, the government inquired with the individuals responsible for the DEEP program that defense counsel claims is the reason release is appropriate. Troublingly, the government has learned information from the DEEP program manager that undermines the information the defendant has submitted to the Court: while it is true that the defendant has been and continues to receive in-custody counseling once per week from a DEEP-trained counselor, the defendant has not been formally accepted into the DEEP program and there is no DEEP plan currently in place were the defendant to be released. Moreover, the DEEP program manager informed the government that the defendant's formal acceptance into the program would require an additional risk evaluation as well as a consultation between the DEEP program and the United States Attorney's Office ("USAO") regarding the USAO's position on the defendant's suitability for the DEEP program. Accordingly, the Court should not credit the

representations in the defendant's letter regarding the need for his release so he can participate in the DEEP program.

        In short, a defendant who is pending sentence for material support for terrorism, and who remains a "moderate risk for terrorist targeted violence" according to the defendant's own evaluation, should not be released from custody just one month before he may receive a lengthy prison sentence. The Court should deny the motion and proceed to sentence the defendant next month, as scheduled.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:       /s/
        Craig R. Heeren
        Josh Hafetz
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of the Court
      Counsel for Defendant

# **EXHIBIT 1**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| AAS:CRH | *271 Cadman Plaza East* |
| F#2017R01183 | *Brooklyn, New York 11201* |

August 29, 2017

By Hand Delivery and ECF

The Honorable James Orenstein
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Parveg Ahmed
>        Docket No. 17-MJ-766 (JO)

Dear Judge Orenstein:

The defendant Parveg Ahmed is scheduled to appear before the Court at 2:00 p.m. on August 29, 2017, for his initial appearance and detention hearing. For the reasons set forth below, the government respectfully requests that the Court enter a permanent order of detention pending trial, absent any combination of bail conditions that would ensure the defendant's continued appearance before the Court and in light of the significant danger that the defendant's pretrial release would pose to the community at large.

I.    Procedural and Factual Background

Ahmed was arrested last night pursuant to a criminal complaint charging him with attempting to provide material support to the Islamic State of Iraq and al Sham ("ISIS"), in violation of Title 18, United States Code, Section 2339B. A copy of the complaint, authorized by Your Honor, is attached hereto as Exhibit A.

A.    ISIS

ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, launching rocket attacks on eastern Lebanon in March 2014, the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or

"caliphate"[1] in Iraq and Syria. On or about October 15, 2004, the United States Secretary of State designated al- Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

B.     The Defendant's Attempt to Join ISIS

The investigation has revealed that the defendant espouses radical ideology and has been an ISIS supporter since at least 2014. Beginning in 2014, the defendant publicly expressed his support of ISIS through social media accounts. For example, in October 2014, the defendant posted the message, "Who are Jihadis? Muslims who fight to establish the Sharia IN THEIR OWN LANDS, wanted by MAJORITY of the people. USA are the real terrorists." Later, in February 2015, the defendant publicly wrote, "The side of Good is Islam & the Caliphate If you're not with the Muslims, you're ignorantly, irrelevantly, & arrogantly on the side of Evil."[2] In March 2015, the defendant posted that "The war on the Islamic State is a war of the ideologies: Democracy/Capitalism v. Shariah Media propaganda/lies villifying the enemy 'ISIS'" and also sent a message to another user of the social media platform, stating "that's what secularism will get you. The only country still working in reverance to the Almighty is the Islamic State." In an interview with FBI agents, the defendant admitted that he had posted the social media messages cited above. A subsequent search of the defendant's personal computer revealed that the defendant also viewed or listened to sermons by the radical Islamic clerics Anwar al-Awlaki and Abdullah el-Faisal. Anwar al-Awlaki was a United States-born radical Islamic cleric and prominent leader of the foreign terrorist organization al Qaeda in the Arabian Peninsula, who was killed on or about September 30, 2011. Abdullah el-Faisal is a Jamaican-born radical Islamic

_____

[1] "Caliphate" is a term that can be used to refer to ISIS's self-proclaimed system of religious governance, with Abu Bakr al-Baghdadi as the caliphate's self-proclaimed leader.

[2] All citations to electronic communications include original grammar, spelling, and punctuation.

cleric, who was found guilty in the United Kingdom of, among other things, solicitation to commit murder, for preaching to followers to kill individuals, including Americans, because he deemed them to be enemies of Islam. Review of the defendant's computer also suggested that the defendant listened to sermons preaching that followers should enter "jihad," that living in the ISIS "Caliphate" is mandatory, and that killing "apostates" is supported by the Quran.

On or about June 1, 2016, the defendant flew from the United States to Saudi Arabia, ostensibly for the purpose of celebrating an Islamic religious holiday. Shortly thereafter, on or about June 9, 2017, the defendant informed his traveling partners that he did not feel well and wanted to stay inside that day. When the traveling partners returned, the defendant and another traveling partner ("CC-1") had disappeared. The investigation revealed that, soon after their departure from Saudi Arabia, the defendant and CC-1 were detained in a Middle Eastern country bordering Syria soon after they had left their party in Saudi Arabia.

Investigating agents subsequently gathered substantial additional evidence proving that the defendant and CC-1 attempted to join ISIS in Syria as foreign fighters. On August 25, 2017, FBI agents conducted an interview of CC-1 in the Middle Eastern country where he had been detained. After waiving his <u>Miranda</u> rights, CC-1 informed the agents, in sum and substance, that (1) the defendant and CC-1 had travelled by cab from Saudi Arabia to the capital of the Middle Eastern country bordering Syria; (2) the defendant called for a cab to Idlib – an area in Syria presently under insurgent control[3]; and (3) the defendant engaged in pro-ISIS proselytization of CC-1, including telling CC-1 "they're good and I should follow." Additionally, a search of devices found in the possession of the defendant and CC-1 at the time of their apprehension revealed, among other things:

- Images associated with ISIS and violent jihad, such as a picture of five men hanging by their necks with the caption "Gay men to be hanged," text justifying attacks on the World Trade Center, and a picture of the leader of ISIS, Abu Bakr al-Baghdadi;

- Messages sent to third parties stating that the user of the phone was "looking to make hijra," meaning seeking to emigrate to ISIS-controlled territories, and seeking to communicate with the third parties through encrypted messaging applications;

- A message stating "[W]e have made it to Dawlatul Islam [ISIS] in Syria. In sha Allah [God willing] we will join the Jihad very soon and in Sha Allah

---

[3] CC-1 claimed that the defendant meant to say "Irbid," which is a city in Jordan.

[God willing] we will then join the ranks of the Shuhuda [martyrs]. The West has invaded the land of the Muslims and is constantly attacking it."; and,

- Internet browsing history to sites reflecting maps of areas currently under ISIS control.

## III.    The Court Should Enter a Permanent Order of Detention

The government respectfully requests that the Court enter a permanent order of detention on grounds of dangerousness and risk of flight.

### A.    Legal Standard

Federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or poses a risk of flight. See 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987). The government is entitled to proceed by proffer. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).

The factors to be considered in determining whether the applicable standard has been met include: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). Because the defendant is charged with attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, there is a statutory presumption in favor of detention. See 18 U.S.C. §§ 3142(e)(3)(C); 2332b(g)(5)(B).

### B.    Analysis

As set forth above, there is a presumption that no condition or combination of conditions will permit the defendant to be released on bond based on the nature of the charge against him. Moreover, the factors referenced above weigh heavily against pre-trial release. The charged offense is serious, particularly in light of the extremely violent nature of the terrorist group the defendant attempted to join and the group's international reach. Indeed, in listing the "nature and circumstances of the offense charged" as a criterion in the detention analysis, the Bail Reform Act specifically provides that the Court is to consider, among other factors, whether the crime charged is a federal crime of terrorism. See 18 U.S.C. § 3142(g)(1).

The weight of the evidence is also strong. The statements made on social media and the recordings found on the defendant's computer demonstrate a strong knowledge of ISIS, an understanding of their terrorist activities, and a desire to support that organization. The actions taken by the defendant—traveling to the Middle East, leaving his travel party, and being found in a country immediately bordering Syria—reflect a clear intent to travel to Syria to join ISIS. Finally, the statements of CC-1 regarding the defendant's pro-ISIS preaching, and the evidence found on the electronic devices reflecting searches for maps of ISIS-controlled area, images of ISIS-related propaganda, and most significantly, a written message expressly stating that the defendant and CC-1 were joining ISIS in Syria to wage violent jihad constitute substantial evidence of the defendant's attempted support of this foreign terrorist organization.

The defendant's history and characteristics also confirm that he is a danger to the community and presents a substantial risk of flight. The defendant poses a danger to the community because his attempt to join ISIS reflects his embrace of an extremely violent ideology. At the time of his apprehension, the defendant possessed a phone containing a written message that he and CC-1 were joining ISIS to become "martyrs," indicating a willingness to die for his violent belief system. Were the defendant to be released, there is every reason to expect he might continue his effort to support ISIS by, for example, engaging in acts of terrorism on American soil. Not even the standard conditions of pretrial release would ensure public safety, as ISIS supporters have repeatedly used household items, such as cooking knives or axes, with deadly effect. Indeed, the defendant viewed or listened to sermons by the radical cleric Anwar al-Awlaki, who is frequently identified as an inspiration for United States-based terrorist attacks. See, e.g., Associated Press, "US terror attacks' common denominator: Anwar al-Awlaki" (Sept. 25, 2017). Moreover, one of the devices found in the defendant's possession contained a number of images associated with ISIS and violent jihad, as well as a text justifying the World Trade Center attacks.

With respect to flight risk, while the defendant is a United States citizen, he has traveled abroad on multiple occasions, and has family connections in foreign countries. His decision to travel from Saudi Arabia to a country bordering Syria indicates a willingness to cross international borders, even at the risk of being arrested. The circumstances of the defendant's apprehension overseas suggests that the defendant is willing to disregard any legal constraints to provide further support to ISIS.

IV.    Conclusion

        For the foregoing reasons, the government respectfully requests that the Court
find the defendant to be a danger to the community and a risk of flight, and order that he be
permanently detained pending trial.


                                            Respectfully submitted,

                                            BRIDGET M. ROHDE
                                            Acting United States Attorney

                            By:       /s/ Craig R. Heeren
                                            Craig R. Heeren
                                            Alexander A. Solomon
                                            Assistant U.S. Attorneys
                                            (718) 254-7000

cc:    Clerk of Court (by ECF)

# **EXHIBIT 2**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH
F.#2017R01183

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 20, 2020

By ECF

The Honorable Ann M. Donnelly
United States District Judge
United States District Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Parveg Ahmed
             Docket No. 17-CR-378 (AMD)

Dear Judge Donnelly:

      The government respectfully submits this letter in opposition to the defendant's May 14, 2020 motion for release from the Metropolitan Detention Center in Brooklyn ("MDC") due to the COVID-19 pandemic. *See* Defendant's Motion, dated May 14, 2020 ("Def. Mot.").

      As set forth below, the defendant pled guilty to attempting to provide material support and resources to a foreign terrorist organization after he traveled to the Middle East in an attempt to join the Islamic State of Iraq and al-Sham ("ISIS") in Syria, and to martyr himself in furtherance of ISIS's violent terrorist cause. Before his arrest, the defendant wrote that he planned to "join the ranks of the Shuhuda" [sic], a reference to the ISIS terrorists who consider themselves martyrs when they die in a terrorist attack, and listened to propaganda that claimed that killing "apostates" was supported by the Quran. Given his offense conduct, to which he has now pleaded guilty, and the substantial term of imprisonment he faces upon sentencing, the defendant presents both a substantial risk of danger to the community and risk of flight. The present COVID-19 pandemic does not alter these facts, particularly given that the defendant is a healthy 24-year-old and identifies no health issue or condition that would put him at particular risk of harm from COVID-19. The Court should deny the defendant's motion.

I.   Background

   A.   The Islamic State of Iraq and al-Sham

   ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad. ISIS supporters have claimed responsibility for several attacks in the United States, including: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; and the June 2016 shooting in Orlando, Florida, at the Pulse nightclub. ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; and the Easter Sunday 2019 series of suicide bombings in Sri Lanka.

   ISIS has released multiple audio and video messages purporting to be from its self-proclaimed leader, Abu Bakr al-Baghdadi, advocating continued violence by ISIS supporters.[1]  On June 29, 2014, ISIS released an audio recording declaring a "caliphate" consisting of territory under ISIS control in Iraq and Syria, and stating that Baghdadi would be the "caliph" or "leader for Muslims everywhere." On July 5, 2014, ISIS released a video recording in which Baghdadi urged Muslims from across the world to "do jihad in the cause of God, incite the believers and be patient in the face of this hardship." On May 14, 2015, ISIS released an audio recording in which Baghdadi urged Muslims to take up arms on behalf of ISIS by either traveling to the Middle East to fight for ISIS or launching attacks wherever they were. On September 29, 2017, ISIS released an audio recording in which Baghdadi again urged his followers to continue to attack the U.S. and its allies, saying: "Carry on your jihad and your blessed operations. Let not the crusaders enjoy life in their homelands while your brothers are subjected to bombardment and destruction." As recently as April 2019, ISIS released an eighteen-minute video from al-Baghdadi, in which he stated, among other exhortations, that "jihad continues until judgment day"; congratulated ISIS cells in Libya, Burkina Faso and Mali on then-recent attacks or pledges of allegiance to ISIS; claimed that the Sri Lanka Easter Sunday bombings were "in revenge"; and exhorted ISIS followers to "drain their enemies of all their human, military, economic and logistical capabilities."

   These activities are part of ISIS's broader goal of forming an Islamic state or "caliphate." At various times over the past few years, ISIS has controlled territory in Syria,

---

[1] On or about October 27, 2019, it was publicly reported that Abu Bakr al-Baghdadi had died. On or about October 31, 2019, it was publicly reported that ISIS had named Abu Ibrahim al-Hashemi al-Qurayshi as its new leader.

Iraq, and Libya. ISIS supporters also maintain a presence in other countries. ISIS is a designated Foreign Terrorist Organization.[2]

B.    The Defendant's Provision of Material Support and Resources to ISIS

The defendant traveled in 2017 with a friend and coconspirator to the Middle East, with the goal of joining ISIS in Syria and fighting and martyring himself in support of ISIS's violent aims.

Since at least 2014, the defendant has publicly expressed his support of ISIS through social media accounts. For example, in October 2014, the defendant posted the message, "Who are Jihadis? Muslims who fight to establish the Sharia IN THEIR OWN LANDS, wanted by MAJORITY of the people. USA are the real terrorists."[3] Later, in February 2015, the defendant publicly wrote, "The side of Good is Islam & the Caliphate If you're not with the Muslims, you're ignorantly, irrelevantly, & arrogantly on the side of Evil." In March 2015, the defendant posted that "The war on the Islamic State is a war of the ideologies: Democracy/Capitalism v. Shariah Media propaganda/lies villifying the enemy 'ISIS'" and also sent a message to another user of the social media platform, stating "that's what secularism will get you. The only country still working in reverance to the Almighty is the Islamic State."

Moreover, when asked about these posts during an interview with U.S. law enforcement in 2016, the defendant initially lied about posting statements in support of ISIS or jihadist movements, denying that he had ever done so. The defendant admitted that he had posted these social media messages only after being confronted with evidence of the conduct. A subsequent search of the defendant's personal computer in 2017, after he was detained for trying to travel to Syria to join ISIS, revealed that the defendant also viewed or listened to

---

[2] On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq, then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

[3] All citations to electronic communications include original grammar, spelling, and punctuation.

sermons by the radical Islamic clerics Anwar al-Awlaki and Abdullah el-Faisal. Anwar al-Awlaki was a United States-born radical Islamic cleric and prominent leader of the foreign terrorist organization al Qaeda in the Arabian Peninsula, who was killed on or about September 30, 2011. Abdullah el-Faisal is a Jamaican-born radical Islamic cleric, who was found guilty in the United Kingdom of, among other things, solicitation to commit murder, for preaching to followers to kill individuals, including Americans, because he deemed them to be enemies of Islam. Al-Awlaki and el-Faisal are commonly regarded as two of the leading figures inciting English-speaking Muslims to participate in violent jihad. Review of the defendant's computer also indicated that the defendant listened to sermons preaching that followers should enter "jihad," that living in the ISIS "Caliphate" is mandatory, and that killing "apostates" is supported by the Quran.

In addition to proselytizing about ISIS and radical jihadist beliefs on social media, the defendant also tried to convert his family to ISIS's violent terrorist cause. According to the defendant's family members, while they were practitioners of the Islamic faith, at some unspecified time the defendant grew more devoutly religious than typical for their family, grew a beard that is consistent with a more strict interpretation of Islamic law, and engaged in other more strict religious practices. The defendant attempted to convince his family to move to ISIS-controlled territory in the Middle East. He informed the family members, in sum and substance, that it would be better for his family to live in ISIS-controlled territory, and he believed the Quran required that they live in ISIS-controlled territory. The defendant also told family members, in sum and substance, that "there was legitimacy to [ISIS's] violence upon people." A family member also observed the defendant watching what appeared to be an ISIS propaganda video, which involved burning individuals to death.

On or about June 1, 2017, the defendant flew from the United States to Saudi Arabia, ostensibly for the purpose of celebrating an Islamic religious holiday. The defendant traveled with his family, and his friend and coconspirator Rasheedul Mowla. Shortly thereafter, on or about June 9, 2017, the defendant informed his family members that he did not feel well and wanted to stay inside that day. Mowla stayed behind with the defendant. When the family members returned, the defendant and Mowla had disappeared. The investigation revealed that the defendant and Mowla left Saudi Arabia and were subsequently detained in Jordan, a country that borders Syria.

The defendant and Mowla had multiple electronic devices in their possession at the time they were taken into custody in Jordan. An examination of those devices confirmed that they were attempting to travel to ISIS-controlled territory in Syria in order to wage violent jihad. Among other things, law enforcement discovered the following on these devices:

- A message stating "[W]e have made it to Dawlatul Islam [ISIS] in Syria. In sha Allah [God willing] we will join the Jihad very soon and in Sha Allah [God willing] we will then join the ranks of the Shuhuda [martyrs]. The West has invaded the land of the Muslims and is constantly attacking it." The message appeared to be a draft that the defendant and Mowla intended to send after their arrival in Syria.

- Images associated with ISIS and violent jihad, such as a picture of five men hanging by their necks with the caption "Gay men to be hanged," text justifying attacks on the World Trade Center, and a picture of the now-deceased leader of ISIS, Abu Bakr al-Baghdadi.

- A message sent on June 9, 2017 – the day the defendant and Mowla left their travel companions in Saudi Arabia – to a third party stating "In Saudi looking for hijra," meaning that the user was in Saudi Arabia ("Saudi") seeking to emigrate to ISIS-controlled territories ("looking for hijra"). The devices also included multiple additional messages to third parties about "hijra," which in context refers to traveling to join ISIS.

- Internet browsing history that reflects a viewing on June 16, 2017 of a BBC news article titled "Islamic State and the crisis in Iraq and Syria in maps," and a view on June 17, 2017 of a website for an ISIS "live" map.

- Notes of farewell directed to the defendant's brothers, dated June 15, 2017, where the defendant discussed death and implied that he would never see them again.

- Evidence that the defendant and Mowla were planning to deceive law enforcement by creating a false alibi, as well as evidence indicating that the defendant and Mowla were attempting to delete or destroy electronic evidence.

On August 29, 2017, the defendant was deported back to the United States. After being taken into custody by U.S. law enforcement, the defendant waived his rights under Miranda, and agreed to be interviewed. In sum and substance, the defendant admitted that he had traveled from Saudi Arabia to Jordan, and claimed that he was arrested after he requested a hotel taxi to "Irbid" (a city in Jordan) but accidentally said "Idlib" (a Syrian city under jihadist control). After being confronted with some of the electronic evidence described above, the defendant denied any plan to join ISIS, instead claiming that the materials were "accidentally" downloaded to his device, and that he researched Syria and ISIS after he realized that he had said the wrong city's name and might be taken through Syrian territory by the taxi driver. The defendant also stated, in sum and substance, and in part, that he "used to" support ISIS but did not do so any longer because he had learned more about ISIS and now believed what they were doing was "incorrect."

Information provided by the defendant's coconspirator confirms that the two were trying to reach Syria to join and fight for ISIS. On August 25, 2017, FBI agents interviewed Mowla. After waiving his Miranda rights, Mowla informed the agents, in sum and substance, that (1) the defendant and Mowla had traveled by cab from Saudi Arabia to Jordan; (2) the defendant called for a cab to Idlib – an area in Syria presently under insurgent control – but meant to say "Irbid," a city in Jordan; and (3) the defendant engaged in pro-ISIS proselytization of Mowla, including telling Mowla "they're good and I should follow." On August 29, 2017, Mowla again agreed to be interviewed by law enforcement. During this interview, Mowla recanted his claim that the defendant misspoke when he requested a taxi to

travel to Idlib, and admitted that the defendant was trying to get to Syria to fight for ISIS. Mowla also stated, in sum and substance and in part, that the defendant (1) described ISIS members as "freedom fighters" and justified their attacks and violence as appropriate; (2) directed Mowla to watch ISIS propaganda videos; (3) instructed Mowla that Mowla had to follow "the leader of the Caliphate to be a Muslim"; and (4) stated that he wanted to die in service of ISIS.

### C.     Procedural History

On August 28, 2017, the defendant was arrested and charged by complaint with attempting to provide material support to ISIS.  On September 26, 2017, a grand jury in the Eastern District of New York issued an indictment charging the defendant with one count of attempting to provide material support to ISIS, in violation of Title 18, United States Code, Section 2339B.[4]  On June 20, 2018, the defendant pled guilty to the sole count of the indictment.  As reflected in the plea agreement, the statutory maximum term of imprisonment is 20 years.  The plea agreement calculated an estimated United States Sentencing Guidelines ("U.S.S.G.") range of 360 months to life, with an effective Guidelines range of 240 months due to the statutory maximum term.

A sentencing hearing was originally scheduled for December 6, 2018, but the defendant has requested that the sentencing be adjourned six times.  See Docket Entry Nos. 22, 26-30.  The government is prepared to proceed to sentencing.

## II.     The Defendant's Bail Motion Should Be Denied

On May 14, 2020, the defendant moved for bail due to the potential that he could contract COVID-19 while incarcerated at the MDC.  The defendant, who is 24 years old, is not identified as "high risk" by the Bureau of Prisons ("BOP"), nor does he identify any health issue or condition that would put him at particular risk of harm from COVID-19.  Instead, the defendant argues that his potential exposure to COVID-19 at the MDC is, on its own, an "exceptional reason" for his release under the Bail Reform Act, and that he is neither a flight risk nor a danger to the community.

### A.     The Defendant Remains Both a Flight Risk and a Danger to the Community

As discussed above, the defendant pled guilty to attempting to provide material support to ISIS.  Accordingly, under the Bail Reform Act, the Court "shall order that a person who has been found guilty of [this type of an offense] and is awaiting imposition or execution of a sentence be detained" unless two conditions are met:  first, either (i) the Court finds there

---

[4] Mowla was charged in a separate indictment with one count each of conspiracy to provide material support to ISIS, and attempting to provide material support to ISIS.  See United States v. Mowla, No. 18-CR-487 (AMD).  Mowla is presently in custody and awaiting trial.

is "a substantial likelihood that a motion for acquittal or new trial will be granted" or (ii) "an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person;" and second, that the Court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community."[5] 18 U.S.C. § 3143(a)(2).

The government will not recommend a sentence of no imprisonment, and is unaware of any reason why a motion for acquittal or new trial would be granted in this case (and no such motion has been filed by the defendant). Even if either of these two prongs were satisfied, however, the Court could not find "clear and convincing evidence" for release, because the relevant factors all militate towards the continued detention of the defendant.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the weight of the evidence against the defendant. See 18 U.S.C. § 3142(g). The four factors typically guide courts' analysis as to both risk of flight and dangerousness. See, e.g., United States v. Horton, No. 16-CR-212 (LAK), 2016 WL 6126669, at *8-13 (S.D.N.Y. Oct. 20, 2016). Contrary to the defendant's assertion,[6] the burden of proof to show such clear and convincing evidence rests with the defendant. See, e.g., United States v. Madoff, 316 F. App'x 58, 59 (2d Cir. 2009). The defendant cannot meet that burden for the following reasons:

First, the defendant was charged and convicted of a crime that demonstrates both his dangerousness and risk of flight. The defendant left the United States with the expectation that he would never return, because he hoped to join ISIS and die a martyr to its radical ideology. The defendant was so committed to his plan that he lied to his family members with whom he traveled, attempted to travel through multiple countries in the Middle East (including war-torn Syria), drafted a letter describing his plan to martyr himself, and wrote a second "farewell" letter to his brothers. In other words, the defendant's own conduct reflects a person whose devotion to ISIS overwhelmed any ties he might have to the United States and a willingness to leave his own family behind forever. Given his past conduct, the risk that the defendant would again try to leave the United States is extremely high. Similarly, the defendant's own statements and actions demonstrate the danger he would create for the community. The defendant has described ISIS's acts of terrorism as the legitimate use of

---

[5] The more rigorous of the two standards for release under Section 3143 applies because the defendant pled guilty to a federal crime of terrorism for which a maximum term of imprisonment of 10 years or more is prescribed. See 18 U.S.C. §§ 3142(f)(1)(A); 3143(a)(2); 2332b(g)(5)(B).

[6] See, e.g., Def. Mot. at 3 ("Certainly, the government is unable to prove such danger by clear and convincing evidence.").

violence, identified those opposed to ISIS as "on the side of Evil," and reviewed propaganda that justifies the killing of supposed "apostates." The defendant watched videos of jihadists burning people to death, and, when confronted by his coconspirator about savage acts by ISIS like beheading, the defendant acknowledge that they occurred and indicated he was comfortable with such conduct. The defendant's conduct reflected a firm commitment to take up arms on behalf of ISIS, kill others, and die on ISIS's behalf. Indeed, in the context of detention proceedings, the Second Circuit has explained that a court is entitled to conclude that "a person in this country who criminally commits to supporting ISIS clearly and convincingly presents a danger to United States persons and communities in this country, as well as abroad." United States v. Khusanov, 731 F. App'x 19, 23 (2d Cir. 2018).[7] In such circumstances, bail is inappropriate.

Moreover, the defendant faces a substantial prison term once he is sentenced. Because the defendant's Guidelines range is 360 months to life, the defendant faces an effective Guideline sentence of 20 years, the statutory maximum for his crime. Such a lengthy sentence provides a powerful incentive for the defendant to flee. See, e.g., United States v. El-Gabrowny, 35 F.3d 63, 65 (2d Cir. 1994) ("If convicted of the crimes of which he is accused, the defendant will face a probable very lengthy term of imprisonment. This prospect gives him a great incentive to flee[.]"); United States v. Liebowitz, 669 F. App'x 603, 605 (2d Cir. 2016) ("The lengthy jail sentence that could be imposed for the charged crimes provides an incentive to flee." (citing United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007)). Indeed, that the defendant has repeatedly requested to adjourn his sentencing, yielding a delay of 18 months from the originally scheduled sentence date, strongly suggests that he expects to receive substantially more than a de minimis sentence.

Second, the defendant's history and characteristics likewise weigh in favor of continued detention. The defendant notes he has no other criminal history. See Def. Mot. at 3. But the defendant vocally supported ISIS for at least three years prior to his ultimate decision to travel to Syria and take up arms for this violent cause. The defendant's interest in violence and desire to leave the United States to engage in violence was not some brief and terrible mistake, but rather a long-term goal that he was sufficiently committed to carry out. And although the defendant claims to be reformed and regretful of his conduct (see Def. Mot. at 4-5), the defendant's history is reflective of a person willing to lie whenever questioned about his interest in ISIS and belief in violent jihad. In 2016, he lied to law enforcement and claimed to have never posted social media messages in support of jihad and ISIS. In 2017, he lied to his family so that he could leave Saudi Arabia and go to Syria. After he was detained, the defendant again lied and claimed he was not trying to join ISIS in Syria, and concocted an elaborate claim about trying to travel to a place in Jordan with a similar-sounding name. The

---

[7] Thus, the defendant's effort in his bail application to limit consideration of his conduct to that which took place in the United States (see Def. Mot. at 3 (referring to the defendant's actions that "*took place in the United States*" (emphasis in original))) is of no moment. As the Khusanov court held, it is proper to consider also the danger that a defendant poses to individuals abroad. See Khusanov, 731 F. App'x at 23.

defendant's willingness to lie to his family, and to leave them behind forever squarely contradict his claim that their presence as suretors will reduce his risk of flight or danger to the community. See Def. Mot. at 3. The defendant has provided no reason to believe his history should inspire confidence that he will not flee or be a danger to his community, and every reason to believe that he is claiming contrition in order to be released from prison.

Third, the seriousness of the danger posed by the defendant's release is self-evident. As discussed above, the defendant was willing to travel across the world, leave his family behind, take up arms and die as a supposed martyr to ISIS's cause. It is proper to infer that the defendant remains devoted to violence on behalf of this organization, and that he is capable of committing an act of violence against members of his community if he were released and if such action was perceived to be in the service of radical jihad.

Fourth, the weight of the evidence in this case is overwhelming. The government was prepared to proceed to trial and prove the case based on, among other things, the testimony of witnesses to the defendant's long-term support for ISIS, electronic evidence proving that he intended to provide support for the ISIS and to die on its behalf, and the defendant's own admissions that he was an ISIS supporter. It is unsurprising that the defendant chose to plead guilty rather than risk trial.

The defendant appears to argue that the court should release him because he claims that ISIS "has been destroyed." See Def. Mot. at 3-4. First, the claim is not true. Public reporting indicates that, as recently as last week, ISIS militants remained a threat and were involved in conduct that includes suicide bombings and sophisticated ambushes. See, e.g., Louisa Loveluck and Mustafa Salim, "ISIS exploits Iraq's coronavirus lockdown to step up attacks," Washington Post, May 8, 2020;[8] Elizabeth McLaughlin, "'Risk of mass breakout' at ISIS prison camps in Syria: report," ABC News, May 14, 2020. It is unsurprising then that, almost immediately after claiming that ISIS is "destroyed," the defendant backpedals and concedes that ISIS may "continue to pose a threat." Def. Mot. at 4. Second, even if ISIS were "destroyed" and could no longer hold physical territory, it is a cardinal tenet of the organization that supporters should engage in terrorist activities in their home nations if they cannot come and fight to establish and support the "Caliphate" in the Middle East. Indeed, several individuals have conducted or attempted to conduct attacks in the United States precisely because of this belief. See, e.g., Superseding Indictment, United States v. Saipov, No. 17-CR-722 (S.D.N.Y.) (D.E. 61) (charging defendant with material support for ISIS for terrorist attack on West Side Highway of Manhattan that caused eight deaths, and providing examples of how ISIS "encourag[es] others who are unable to travel to the Middle East to instead conduct attacks in other countries."). The idea that the defendant should be released and is no longer a danger because ISIS may be less of a threat is both factually incorrect and illogical.

---

[8] Available at https://www.washingtonpost.com/world/middle_east/isis-exploits-iraqs-coronavirus-lockdowns-to-step-up-attacks/2020/05/07/1513edee-8f98-11ea-9322-a29e75effc93_story.html

The defendant has not met, and cannot meet, his burden of proving by clear and convincing evidence that he is neither a flight risk nor a danger to the community. Rather, all four factors show that the defendant is in fact both of those things. Accordingly, the defendant's motion should be denied.

B.    The Defendant Cannot Meet the Narrow "Exceptional Reasons" Standard

The defendant argues that his release is warranted under 18 U.S.C. § 3145(c). Section 3145(c) states that "[a] person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." This statute is a "narrow exception" to the general rule requiring post-conviction detention under Section 3143. See, e.g., United States v. Ellison, No. 18-CR-834 (PAE), 2020 WL 1989301, at *3-4 (S.D.N.Y. Apr. 27, 2020) (denying bail motion of gang member based on COVID-19 pandemic). The defendant cannot satisfy this narrow exception for two independent reasons.

i.    The Defendant Fails to Meet the "Clear and Convincing" Threshold

First, as the plain language of the statute indicates, Section 3145(c) requires as a predicate that the defendant prove by the "clear and convincing" standard that he is not a flight risk or danger to the community under Section 3143. See, e.g., United States v. Todd, No. 12-CR-45 (RJS) (S.D.N.Y.), 2020 WL 1974219, at *2 (Apr. 24, 2020) (Sullivan, J., sitting by district designation) ("The statute contains a narrow exception, however, where a defendant: (1) meets the requisite conditions for release set forth in 18 U.S.C. § 3143(b)(1), and (2) "clearly show[s] that there are exceptional reasons" why his detention would not be appropriate.") (emphasis added). As discussed above, the defendant cannot meet the "clear and convincing" standard because all the relevant factors indicate that he is both a danger to the community and serious flight risk. Failure to meet this threshold requirement is fatal to the defendant's claim. See, e.g., Todd, 2020 WL 1974219 at *2 ("Even assuming that the COVID-19 threat and [the defendant's] asthma . . . constitute "exceptional reasons" weighing against [the defendant's] detention, release is not permitted since [the defendant] presents both a danger to his community and a risk of flight.); Ellison, 2020 WL 1989301, at *3-4 (holding that the defendant could not make the "necessary threshold showing under         § 3145(c)" because "[the defendant's] history makes overwhelmingly clear that, if at liberty even subject to conditions of release, he would pose a grave threat of harm to the community").

Other judges in this district to confront similar claims of the need for release due to the COVID-19 pandemic by terrorism defendants have appropriately concluded that release is not warranted. For instance, in United States v. Redzepagic, the defendant is charged with two counts of attempting to provide material support to a foreign terrorist organization after he twice left the United States to travel to Syria to join ISIS and the al-Nusrah Front (another foreign terrorist organization operating in Syria). Unlike the defendant in this case, the defendant in Redzepagic was still awaiting trial, retained the presumption of innocence and did not bear the burden of proof with regard to detention. Nonetheless, Magistrate Judge

10

Tomlinson denied the defendant's motion for bail, although the defendant had been in pretrial detention for approximately two years because, inter alia, the evidence against the defendant was "strong," his underlying medical condition did not merit release, and counsel would still have ample time to prepare given that a trial date had not yet been set in his case.  See Detention Hr'g Tr., Redzepagic, No. 17-CR-228 (DRH) (E.D.N.Y.) (D.E. 119).  Similarly, in United States v. Khusanov, the defendant was charged with conspiring to and attempting to provide material support to ISIS and al-Nusrah Front, based on his financial assistance to other individuals that were attempting to travel to Syria to wage violent jihad on behalf of these organizations.  The defendant in Khusanov also enjoyed the benefits of the presumption of innocence and a lower standard for release than the defendant in this case.  Judge Kuntz denied release because, among other reasons, the charged conduct "weighs heavily in favor of Defendant's detention," the evidence against the defendant was strong (despite the presence of purported "exculpatory evidence"), and the COVID-19 outbreak was not a sufficiently compelling countervailing reason for release.  See Decision & Order, Khusanov, 17-CR-475 (WFK) (E.D.N.Y.) (D.E. 102).

As with these other similarly situated defendants, the Court should likewise find that the defendant in this case is both a danger and flight risk, and should deny his motion on this basis alone.

> ii.    The Defendant Fails to Demonstrate Exceptional Reasons for Release

Even if the defendant could meet the burden of showing by clear and convincing evidence that he is neither a danger nor a flight risk, he has failed to demonstrate that "exceptional reasons" exist that require his release.  "Exceptional reasons" exist where there is a "unique combination of circumstances giving rise to situations that are out of the ordinary," such as "an unusual legal or factual question."  United States v. DiSomma, 951 F.2d 494, 497 (2d Cir. 1991).  "[P]urely personal" circumstances typically do not rise to the level of "exceptional reasons" warranting release.  See id. (denying release pending sentence where defendant, convicted of drug trafficking, was financially responsible for three young children, including a seven-month old with Bell's Palsy, and his employer claimed defendant was needed to train his replacement at work); United States v. Marcus, No. 05-CR-457 (ARR), 2007 U.S. Dist. LEXIS 109149, at *4 (E.D.N.Y. Sept. 18, 2007) (rejecting the defendant's assertion that his "significant life threatening medical conditions"—coronary heart disease and hypertension—constituted a valid basis to grant release under section 3145(c)).  Ultimately, the question whether "exceptional reasons" exist rests within the sound discretion of the Court. See United States v. Dimattina, 885 F. Supp. 2d 572, 585 (E.D.N.Y. 2012).

The defendant focuses on the overall impact of COVID-19 on the prison population because he is young and healthy and presents no risk factors for COVID-19.  See Def. Mot at 4-6.  The BOP has responded to the COVID-19 pandemic, and developed national

measures to mitigate the spread of COVID-19 within prisons.[9]  These measures, which have been implemented at the MDC, include the following:

- **Suspension of all social visits**: Social visits have been suspended.  Inmates will be provided additional inmate telephone minutes each month.

- **Inmate movement**: All inmate facility transfers have been suspended with limited exceptions.  This suspension, however, does not mean the BOP has ceased all inmate movements.  These movement exceptions may include, but are not limited to, transfers related to forensic studies, writs, Interstate Agreements on Detainers, medical or mental health reasons, and Residential Reentry Center placements.

- **Screening and testing of inmates**: All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors are quarantined. Any inmate currently in BOP custody exhibiting symptoms consistent with COVID-19 will be assessed by the institution's health services staff and placed in medical isolation.  The remainder of the inmates in his or her unit will be quarantined to ensure that additional inmates do not develop symptoms.  The inmate in medical isolation will be evaluated by medical staff at least twice per day, and the inmates on a medically-quarantined unit will have their temperature checked twice per day.  In addition, inmates will be tested for COVID-19 on a case-by-case basis in accordance with local health authority protocols.[10]

- **Modified Operations**:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Moreover, based on letters from the MDC providing status updates with respect to COVID-19 (see, e.g., May 14, 2020 letter from MDC to the Honorable Roslynn R. Mauskopf, Chief Judge for the United States District Court in the Eastern District of New York), the government is aware of the following additional measures that the MDC has taken in light of COVID-19:

- Cleaning supplies are issued once a week.  They are available on each housing unit, and staff have been instructed regarding whom to contact should additional supplies be necessary.

---

[9]  See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[10] According to a report received from the MDC on April 28, 2020, six of the 16 MDC inmates tested for COVID-19 have tested positive.

- Staff are screening each staff member who enters the facility, including temperature scans.

- Inmate orderlies are cleaning the common areas of the institution, and every inmate has been reminded and instructed to continue to wipe down and sanitize their cells.

- Inmates have also been provided instruction via town halls regarding hygiene, and the same guidance is available on TRULINCS.

- Showers are available three days per week.

- Unit team staff are available on a daily basis for inmates to raise issues concerning food, shoes, and medical care.

On April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including:[11]

- Inmates in every BOP institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

- To the extent practicable, inmates will still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP, in conjunction with the United States Marshals Services, is working to significantly decrease incoming movement to all BOP facilities.

As these new measures demonstrate, the BOP is closely monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public.  See United States v. Amador-Rios, No. 18-398, ECF No. 99 (RRM) (E.D.N.Y. Apr. 12, 2020) (recognizing the steps the BOP has taken at the MDC to mitigate risks posed to the inmates, and rejecting the defendant's motion in part because he failed to address those efforts); United States v. Smalls, No. 20-CR-126-LTS, 2020 U.S. Dist. LEXIS 65235, at *6 (S.D.N.Y. Apr. 14, 2020) (noting that the BOP has "implemented policies and consulted with appropriate experts to mitigate the risks posed by COVID-19").

The government does not minimize the risk posed to inmates from COVID-19. But the defendant, who is an apparently healthy 24 year old, does not identify any fact, such as an illness or health condition, that puts him at unique risk to COVID-19 that is any different than the many other individuals who properly remain detained at BOP facilities.  Indeed, courts in this district have declined to release defendants with serious medical conditions or who

---

[11] On April 13, 2020, the BOP ordered an extension of the April 1, 2020 action plan through May 18, 2020.

faced increased risk because of their more advanced age.  See, e.g.,United States v. Brown, No. 19-CR-194 (ERK), E.C.F. No. 72 (E.D.N.Y. May 10, 2020) (denying bail for pre-trial defendant, despite asthma and underdeveloped lung, because defendant was danger to community and flight risk); United States v. Jacobs, No. 18-CR-377 (ERK), E.C.F. No. 33 (E.D.N.Y. May 10, 2020) (denying bail for defendant awaiting sentence, despite asthma, because defendant was danger to community); United States v. Smith, No. 19-CR-137 (ARR), ECF No. 116 (E.D.N.Y. May 4, 2020) (denying bail for defendant awaiting sentence, despite history of low iron, positive tuberculosis test and occasional "chest pains and lack of oxygen" because he is unable to demonstrate that he is not a flight risk); United States v. St. Hill, No. 18-185, ECF No. 280 (FB) (E.D.N.Y. Apr. 12, 2020) (denying bail for drug defendant facing a five-year mandatory minimum sentence despite medical condition of diabetes); United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," after finding that defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged murders); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release 61-year old defendant with asthma based on COVID-19 pandemic).[12]

The defendant relies on various cases in support of his argument for release. None support release in this case.

The primary case cited by the defendant, United States v. McDuffie, is entirely distinguishable.  In that case, the court released a 47-year old defendant who suffered from "rheumatoid arthritis (an autoimmune disease), high blood pressure, and cardiac issues, all of which increase his risk of contracting COVID-19."  United States v. McDuffie, No. 19-CR-212 (VEC), 2020 WL 1659879, at *1 (S.D.N.Y. Apr. 3, 2020).  Notably, the defendant in McDuffie was pending sentence for a less serious crime: a conspiracy to distribute 28 gram or

---

[12] Moreover, courts have also declined to release defendants who based their applications for release on generalized concern about COVID-19 without identifying risk factors particular to those defendants.  See United States v. Lipsky, No. 19-CR-203 (NGG) (E.D.N.Y. Mar. 24, 2020) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Ayoub, No. 20-CR-142 (ENV) (E.D.N.Y. April 1, 2020) (declining to release defendant, previously identified as a flight risk, based on generalized concerns about COVID-19 pandemic); United States v. Acosta, No. 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus").

more of cocaine base in violation of 21 U.S.C. § 841(b)(1)(B).  Id.  And although the defendant faced a sentence of 10 years to life based on his crime of conviction, the defendant's anticipated maximum Guideline sentence was less than half the Guidelines sentence applicable in this case.  See January 12, 2020 Plea Hr'g Tr. at 14, McDuffie, No. 19-CR-212, ECF No. 144 (noting that maximum estimated Guidelines sentence was 108 months).  The defendant's access to firearms, while relevant, was not a part of the defendant's criminal conduct, and therefore was of limited significance to the court given other factors unique to that case.  See 2020 WL 1659879, at *3 (noting that while prior possession of firearms and drugs made the issue of dangerousness a "closer question," home incarceration with a brother who is a retired corrections officer and no known history of violence counseled in favor of release).  Here in contrast, the defendant is much younger than 47 (half as old, in fact), has no health conditions that present risk factors for COVID-19, was convicted of a more serious and more violent offense, and faces an advisory Guidelines sentence twice as high as the defendant in McDuffie.  Put simply, none of the many significant factors that led to the defendant's release in McDuffie exist in the instant case.

The few other cases cited by the defendant are also not helpful as they all likewise reflect wholly different legal and factual settings than the one in this case.  Most significantly, none of the cases cited by the defendant involves the release of a defendant who was convicted of a terrorism offense and is pending a lengthy sentence.  United States v. Jackson, 18-CR-606 (JS) (E.D.N.Y.), involved a pre-trial defendant charged with distributing crack cocaine, and who had serious health issues including obesity, asthma, diabetes, sleep apnea, high blood pressure.  Notably, the defendant was later remanded back to prison for violating her release conditions.  Similarly, United States v. Allen, 18-CR-561 (DLI) (CLP) (E.D.N.Y.), involved a pre-trial drug trafficking defendant with asthma, anemia, sickle-cell, and chest pains.  United States v. Estime, 19 Cr. 711 (NSR) (E.D.N.Y.), involved, as the defendant concedes, bail upon the consent of the government and a defendant charged with a drug crime based on his role in ordering and receiving one kilogram of cocaine.  And United States v. Rivera, 11-CR-20 (RJD) (E.D.N.Y.), involved a defendant pending a violation of supervised release hearing who had already served a two-year state sentence for the conduct comprising the violation along with 3 months in custody where the anticipated Guidelines range was 5 to 11 months.  None of these cases are similar to the facts of the present case, and provide no reason for the court to grant the release of this defendant.[13]

_____

[13] The defendant also provides, in a footnote, a list of decisions where defendants were released.  See Def. Mot at 8 n 3.  The defendant does not identify their relevance apart from the fact that courts have released several defendants due, in part, to the COVID-19 pandemic.  The government does not dispute that, depending on the facts of a particular case, a defendant may satisfy the necessary conditions for pre-trial or pre-sentence release.  But that does not assist with the relevant inquiry in this case.  In fact, several of the cases are clearly distinguishable or there is no public record that would establish the potential relevance of the decision.  See, e.g., United States v. Sienkiewicz, 19-MJ-859 (JO) (E.D.N.Y. Mar. 27, 2020) (releasing defendant who did not present danger to community and who had history of lung and throat cancer on government's consent); United States v. DeAlba, 19-CR-563 (DLI) (SJB) (E.D.N.Y. March 26, 2020) (releasing defendant following government consent to bail

## III.   The Defendant's Bail Package Is Inadequate

Even if the defendant were able to demonstrate by clear and convincing evidence that he is not a danger to the community or flight risk, and that exceptional reasons require his temporary release, the defendant's motion should still be denied because his bail package is insufficient.  The defendant proposes that he be released on home confinement pending sentence based on (i) a $500,000 bond to be co-signed by his father, mother, and older brother; (ii) that he self-quarantine in a hotel for 14 days, followed by home detention with electronic monitoring; (iii) that he have no interaction with convicted felons; (iv) that he be banned from using the internet during his release; and (iv) that he be subjected to drug testing by Pretrial Services.  See Def.'s Mot. at 1 n.1.

The government submits that no condition or combination of conditions, much less the combination of conditions that the defendant proposes, would be sufficient to ensure the defendant's compliance with pre-trial release and ensure that he returns to be sentenced.

Even considered on its merits, the package offered is inadequate.  A $500,000 bond co-signed by three sureties, all of whom are family members, is substantially below any amount that might compel the defendant to return for sentencing in a serious terrorism case. The fact that the defendant's family members are proposed sureties is of limited consequence, since the defendant has already demonstrated a willingness to lie to those same family members and to permanently leave them behind.  The defendant also does not offer to secure as collateral any real or personal property of any value that might give some limited comfort that he would be leaving the government with anything but an empty judgment, should he flee from justice.  His additional proposed conditions of monitored home confinement and a ban on internet access do not alter this analysis.  While internet access would be an avenue for malicious conduct by the defendant, the real concern, as discussed above, is that he will abscond or be a danger to his community; an internet ban does little to assuage those concerns. Electronic monitoring similarly would not defeat a committed individual from committing an act of violence or fleeing custody if he so chose.  Indeed, according to information provided by the Deputy Chief Probation Officer for the Eastern District of New York, the ability to

---

package in narcotics case where defendant had no history of violence); United States v. Eli, 20-CR-50 (RER) (RJD) (E.D.N.Y. Mar. 25, 2020) (temporarily releasing pretrial defendant who suffered from extremely serious health condition that placed him in high-risk category should he contract COVID-19); United States v. Plasencia, 20-MJ-205 (SJB) (E.D.N.Y. March 23, 2020) (releasing defendant on consent who had not previously put forward bail package at arraignment, which led to permanent order of detention with leave to renew); United States v. George, 19-CR-327 (ENV) (E.D.N.Y. Apr. 2, 2020) (releasing defendant with underlying health issues who was experiencing COVID-19 symptoms, who faced 37-to-46 month Guidelines range at sentencing); United States v. Williams, 18-CR-657 (ARR) (pretrial defendant charged with possessing a firearm as a felon released, no basis publicly given for release).

provide restrictions like home detention and electronic monitoring are "immensely limited…as a result of this pandemic" and that "our ability to supervise [a defendant] and limit the risk [he or she] poses to the community are compromised."  See United States v. Jacobs, No. 18-CR-377 (ERK), E.C.F. No. 33 at 2 (E.D.N.Y. May 10, 2020).

        The Court need not reach the merits of the defendant's bail package because he cannot satisfy the rigorous standards for release, but even if the Court were to do so, it should find the proposed package to be inadequate to assure the defendant's return to court and to protect against the danger that he poses to the community.

IV.    <u>Conclusion</u>

        For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion for bail pending sentence.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    <u>/s/ Craig R. Heeren</u>
Craig R. Heeren
Assistant U.S. Attorney
(718) 254-6467

Cc:  Michael K. Schneider, Esq. (by ECF)
Clerk of the Court (AMD) (by email)