Testimony of Richard Aborn

President, Citizens Crime Commission of New York City

House Appropriations Subcommittee on Homeland Security

*Targeted Violence and Terrorism Prevention*

March 24th , 2021


<u>The Citizens Crime Commission's DEEP program</u>

*Working to Prevent Terrorism and Targeted Violence*


The Citizens Crime Commission of New York City is a not-for-profit organization. Our mandate is to develop innovative ideas to help prevent the most vexatious forms of violence. We work on issues of violence related to gangs, illegal gun trafficking, illegal gun carriers (with a specific focus on kids and guns), violent crime and extremism both foreign and domestic. We are also extensively involved in the police reform discussion and related issues around police community relations. While we will occasionally help with the design of law enforcement operations, particularly around illegal guns, our focus is on what we call "precision prevention"; that is, focusing prevention services on those most likely to commit an act of violence. We have done this work in NYC, NYS and other cities in the US. Our multi-disciplinary staff is composed of individuals with backgrounds in psychology, research, professional development and technology. This permits us to develop comprehensive interventions to address the complex behaviors that drive violence.

Our involvement with extremism prevention began with a request from the United States Attorney's office in the Eastern District of New York.  The Eastern District asked if we would be willing to consider using our expertise from our gang intervention work and expanding it to the extremism space, and showed us a nascent project they were developing called "DEEP." There was a clear need. Law enforcement would find itself with extremism cases where a lengthy prison sentence would not be appropriate, but had no other adequate response mechanism. Our DEEP program addresses this need. It is classic prevention. DEEP provides law enforcement with a specialized behavioral intervention, which we deliver, to aid an individual in disengaging from low to mid level extremist activity. It can be utilized at any stage of the criminal justice system, from pre-arrest to post conviction. In traditional terms, it operates as an alterative to incarceration and is now being utilized at both the federal and state level.

After careful internal review, we indicated to the Eastern District that we would undertake the task of creating a specialized behavior-based intervention to address the behavioral drivers motivating an individual toward ideologically-based violence.

To create the program, we spent a year engaging in in-depth research to understand both the progression to engaging in extremist violence, and the most effective interventions for

1

disengagement from violent extremism. We started by engaging in literature reviews and with subject matter experts to get a solid understanding of the problem and the theories surrounding violent extremism and disengagement. We then delved into a variety of case studies – both from public source data and from law enforcement partners – to understand the behavioral drivers that present in this space for this population. We mapped the identified behaviors against corresponding mechanisms of behavior change – this formed the basis of what we knew would need addressing as part of the intervention. In developing the model itself, we drew heavily on the research to determine what works in the disengagement and violent risk reduction spaces. Based off the research, we identified six domains to address as intervention targets for our model: social skills; anxiety; trauma; use of free time, work and education; critical thinking; and family/partner issues. Additionally, we will address other issues that fall outside the areas outlined. This may include, but are not limited to: mental health; serious mental illness; substance use; housing instability; medical issues; and anything else that might need addressing. DEEP is a demobilization program, not a de-radicalization program. That is, we believe that one is entitled to their own beliefs, but not entitled to engage in acts of violence, and DEEP is designed to prevent that from happening. The earlier we can engage, the better. DEEP is ideologically agnostic. We will work with individuals across the entire ideological spectrum; the specific ideology is irrelevant to our intervention work.

While DEEP is only in its initial deployment, in its current form, DEEP receives referrals from the criminal justice system. After we make a preliminary assessment, the case is then referred to an independent forensic psychologist for evaluation. If an individual is deemed low risk, we will likely accept the matter. If the person is deemed moderate risk, we will engage in additional inquiry. In determining an individual's eligibility for the program, we utilize a number of risk and threat assessments, including risk for violence, suicidal ideations, substance abuse, as well as assessment tools specific to the violence extremism space, namely the VERA-2R.

On acceptance, the individual (now referred to as a participant) is referred to a therapist who has been trained in the DEEP methodology. The therapist will develop a treatment plan along with the individual. The intervention will last as long as the person requires (we anticipate nine to fourteen months) and will then be assigned to a transition specialist, and if need be an employment specialist. The transition specialist will help the participant apply the skills, insights and understanding, learned during the intervention into the participant's normal life.

DEEP is in its early stages of implementation. We intend to engage in piloting and evaluation and then, if there is interest, share the learning with other localities.

We will also build community and high school components in an effort to offer the DEEP program to those who may want help de-mobilizing as well, as to family and friends of those who know of someone who is mobilizing. Community outreach will be done with great care to avoid the stigmatization that occurred in past government and civil society efforts.

We understand that the concept of prevention in the terrorism space can be controversial and perhaps unsettling. But prevention is now accepted as a critical component of any public safety strategy, and should be no less for terrorism, especially as we wisely see the greater utilization of

a public health approach to crime prevention.  We understand that things will not always work out. But if we are careful and methodical, we can greatly impact the risk of violence, which is well worth the effort.

We are very grateful to Seth DuCharme, US Attorney in the Eastern District who not only originated the idea of DEEP but was willing to lend his personal support to our efforts to develop and implement the program. And to the Office for Targeted Violence and Terrorism Prevention at DHS, and in particular its Director, John Picarelli. Long before Congress appropriated funds to this effort, John and his team quickly became a very capable partner in our endless discussion of how to best develop prevention of extremism in the US and in particular, lent us significant expertise and introductions as we went about our work. It is not overblown to say that we would not be here but for their support. Finally, we ae deeply indebted to Congress for appropriating these funds. Without this funding we would not be able to operate our program.

3